# Lackawanna County Government Study Commission v. Scranton Times, L.P.

C.P. of Lackawanna County, No. 14 CV 4427

*Frank J. Ruggerio*, for petitioner.
*Michael F. Cosgrove*, for respondent.
*Peter Paul Olszewski, Jr., Melissa A. Scartelli* and *Daniel T. Brier*, for intervenors.

NEALON, *J.*, Nov. 14, 2014—This appeal under the Right to Know Law (RTKL), 65 P.S. § 67.101 *et seq.*, concerns a local newspaper's request for unredacted copies of three emails contained in the investigative materials that were produced for public inspection by

a private investigator who was retained by the former Lackawanna County Government Study Commission ("the Commission"). In its only official authorizing action, the Commission voted "to empower" its counsel to conduct an investigation and to retain a private investigator, if necessary, to examine Lackawanna County's lease and child care agreements with a child care services vendor, to determine whether any vendors that had admitted making illegal payments to two former County Commissioners continued to do business with the County, and to ascertain whether those vendors had contributed to the campaign committees of the current County Commissioners. After the Commission's counsel executed a contract with the private investigator to perform that "limited review" or investigation, the Commission's Chair later announced that the scope of the investigation had been expanded to include review of any contracts involving the County's Prison, Recycling Center, Stadium Authority and Railroad Authority, and the operation of the Wilkes-Barre/Scranton International Airport.

In his report, which was issued seventy-eight days after the Commission had adopted its final report of findings and recommendations, the private investigator reviewed the assigned items but did not provide any analysis of the available forms of county government or how another form of government would be more efficient or accountable. Based upon "several concerns" expressed by unidentified "stakeholders" regarding the "actions of airport personnel," the private investigator recommended "an independent investigation by an outside law enforcement agency." On its final day of existence under the Home Rule Charter and Optional Plans Law ("HRC & OPL"), 53 Pa. C.S. § 2901 *et seq.*, the Commission adopted a resolution authorizing the private investigator to deliver his "full and complete findings to law enforcement," and the investigator

thereafter furnished his investigatory materials to the Federal Bureau of Investigation ("FBI"). However, in response to the newspaper's RTKL request for copies of the private investigator's records, the investigator redacted the identities of individuals who forwarded emails to him regarding a television reporter's interview of a County Commissioner and the tax assessment reduction for a property that is leased by the County.

Under the RTKL, any documents within the actual or constructive possession of the Commission and its private investigator are presumed to be public records that must be made available to a requester unless they are exempt under an enumerated statutory exception. The Commission concedes that the private investigator's records are generally discoverable under Section 506(d)(1) of the RTKL, 65 P.S. § 67.506(b)(1), but the Commission and its private investigator contend that his materials are nonetheless exempt from disclosure by 65 P.S. § 67.708(b) (17) governing records "relating to a noncriminal investigation." The Commission and the investigator bear the burden of proving that the unredacted records being sought by the newspaper are protected from disclosure under the "noncriminal investigation" exemption, which exemption must be narrowly construed due to the RTKL's remedial nature.

For the investigator's materials to be exempt from disclosure under the "noncriminal investigation" exemption, appellate authority requires that: (1) the investigation be part of the Commission's "official duties as established by [its] enabling legislation," i.e., the HRC & OPL; and (2) the investigation be a systematic and recurrent examination, rather than "a one-time inquiry." Under the HRC & OPL, the Commission's "official duties" were to study the existing and available forms

of county government, to determine whether a particular form of government was stronger or more efficient and accountable, and to recommend whether a different form of government should be adopted. The HRC & OPL did not vest the Commission with the authority to scrutinize County contracts, inspect campaign committee reports, or publicly demand "an independent investigation by an outside law enforcement agency" of unidentified employees based upon allegations made by anonymous "stakeholders." Nor does the content of the redacted emails in dispute relate to matters that were within the Commission's "official duties" under the HRC & OPL. Therefore, the Commission has not satisfied its burden of proving that the subjects of the investigator's "limited review," which post-dated the Commission's final report and recommendations by two and one-half months, were part of the Commission's "official duties" under its enabling legislation.

Furthermore, even if the investigator's "limited review" fell within the Commission's "official duties," the investigator's materials still do not qualify for protection under the "noncriminal investigation" exemption. During the evidentiary hearing, the investigator admitted under oath that he conducted "a one-time inquiry," which makes his investigative materials ineligible for the "noncriminal investigation" exemption under Commonwealth Court precedent. Additionally, the FBI has advised the investigator that it has no objection to the public disclosure of the investigator's unredacted work papers, and the federal prosecutor similarly has confirmed in writing that his office "has no interest concerning the discoverability" of the records being sought in this RTKL appeal.

Consequently, the Commission and its investigator have not established that the investigator's records, whether in

paper or electronic form, are exempt from public access under Section 708(b)(17) of the RTKL. Pursuant to 65 P.S. § 67.506(d)(1), the investigator will be ordered to obtain and produce the redacted identities of the three emails that were previously provided to the newspaper with those identities redacted. Accordingly, to the extent that the final determination of the office of open records required such unredacted production of the investigator's records, its administrative decision will be affirmed.

## I. FACTUAL BACKGROUND

On May 21, 2013, the Lackawanna County electors approved a referendum question for the election of a government study commission, and elected seven individuals to serve as members of the Lackawanna County Government Study Commission ("the Commission") "to study the existing form of government of Lackawanna County, to consider the advisability of the adoption of an optional form of government, and to recommend whether or not an optional plan of government should be adopted" in Lackawanna County. *See In re Referendum Petition for Government Study Commission*, 2013 WL 1103067, at *28 (Lacka. Co. 2013), *aff'd*, No. 430 C.D. 2013 (Pa. Cmwlth. April 15, 2013). The statutory authority of a government study commission is set forth in Section 2918 of Subchapter B of the HRC & OPL, which provides that "[t]he government study commission shall study the form of government of the municipality to compare it with other available forms under the laws of this Commonwealth and determine whether or not in its judgment the government could be strengthened or made more clearly responsible or accountable to the people or whether its operation could become more economical or efficient under a changed form of government." 54 Pa.C.S. § 2918. Section 2920 of the HRC & OPL charges the government study commission with the responsibility to conduct "public

hearings" and "sponsor public forums," and mandates that the government study commission "shall provide for the widest possible public information and discussion respecting the purposes and progress of its work." 53 Pa.C.S. § 2920.

At the conclusion of its study, the government study commission must issue a report recommending one of four enumerated actions under Section 2923 of the HRC & OPL: (1) a referendum to adopt one of the optional plans of government; (2) a referendum to adopt a home rule charter; (3) that the form of government remain unchanged; or (4) any other action consistent with its functions under Subchapter B of the HRC & OPL. *Pilchesky v. Lackawanna County*, 88 A.3d 954, 966 (Pa. 2014) (citing 53 Pa.C.S. § 2923). If the government study commission recommends the adoption of an optional plan of government, its report must also specify the number of members to serve on the governing council, whether those members will be elected at-large, by district or on a combination at-large and district basis, the designation of those districts, whether the council manager will be elected by the voters or appointed by the council members, and whether the offices of treasurer and controller will be omitted, appointed or elected. *See* 53 Pa.C.S. § 2924; *In re Referendum Petition for Government Study Commission*, *supra*, at *27. Upon the discharge of the government study commission pursuant to 53 Pa.C.S. § 2922, "[a]ll the records, reports, tapes, minutes of meetings and written discussions of the commission shall ... be turned over to the municipal clerk or secretary for permanent safekeeping and made available for public inspection at any time during regular business hours." 53 Pa.C.S. § 2921(d).

At its first public meeting on June 27, 2013, the Commission elected Charles J. Volpe ("Volpe") as

chairman and Michael A. Giannetta ("Giannetta") as secretary pursuant to 53 Pa.C.S. §2916(a). (Transcript of Proceedings ("T.P.") on 10/16/14 at pp. 107, 153). During the Commission's public hearing on November 13, 2013, the owner of a child day care center voiced his objections to a lease agreement that Lackawanna County had entered into with Hildebrandt Learning Center, LLC, to rent space at the Lackawanna County Visitor's Center, and asserted "[t]hat Lackawanna County has no business encroaching in on a child care business." (Transcript of Lackawanna County Government Study Commission hearing on 11/13/13, filed as docket entry no. 30, at pp. 30-42). Following public discussion regarding that lease agreement, Volpe made a motion "to empower Mr. [Frank J.] Ruggerio as our general counsel" to conduct an investigation, "[e]ven to the point of, if you need to retain, investigative authorities." (*Id.* at pp. 83-84). The Commission's counsel was instructed to investigate (a) the County's lease agreement with Hildebrandt Learning Center, (b) whether any vendors who had admitted "bribing [former Lackawanna County Commissioners A. J.] Munchak and [Robert] Cordaro" to obtain contract work with Lackawanna County were "still, in fact, doing business with the County," and (c) whether any of those same vendors were "still contributing to the current [Lackawanna County] Commissioners' campaigns."[1] (*Id.* at pp. 86-88). After Volpe's motion

---

1. Robert C. Cordaro ("Cordaro") and A. J. Munchak ("Munchak") served as the majority County Commissioners for Lackawanna County from January 2004 to January 2008. *See U.S. v. Munchak*, 527 Fed. Appx. 191, 192 (3d Cir. 2013). In June 2011, a federal jury convicted Cordaro of conspiracy to commit bribery, two counts of bribery, conspiracy to commit extortion under color of official right, two counts of extortion, conspiracy to commit money laundering, three counts of money laundering, racketeering, conspiracy to commit racketeering, conspiracy to defraud the United States, three counts of filing materially false tax returns, and two counts of tax evasion, and on January 30, 2012, U. S. District Judge A. Richard Caputo sentenced Cordaro to an eleven

was passed unanimously by the Commission members, (*Id.* at p. 88), Volpe directed the Commission's counsel "to do a very thorough investigation," which would "be more than research," and to "turn that information over to the appropriate law enforcement authorities" if the Commission's members "believe[d] that probable cause has been reached" for possible criminal activity. (*Id.* at pp. 95, 97).

On November 26, 2013, the Commission's counsel and a private investigator, James F. Seidel of Seidel Investigations and Consulting, Inc. ("Seidel"), executed a one page agreement by virtue of which the Commission retained Seidel "to perform a limited review (performance audit) of Lackawanna County's financial and operating activities...to identify areas of County government that if changed, may reduce costs or streamline County government."[2] (Docket entry no. 10, Exhibit A). At the

---

year term of imprisonment. *U. S. v. Cordaro*, 2012 WL 3113933, at *1 (M.D. Pa. 2012), *aff'd*, 527 Fed. Appx. 191 (3d Cir. 2013). During the same criminal trial, Munchak was convicted of conspiracy to commit bribery, two counts of bribery, conspiracy to commit extortion under color of official right, two counts of extortion, filing a materially false tax return, and income tax evasion, *U. S. v. Munchak*, 2011 WL 4005014, at * 1 (M.D. Pa. 2011), *aff'd*, 527 Fed. Appx. 191 (3d Cir. 2013), and on January 30, 2012, was sentenced to a term of seven years incarceration. *U. S. v. Munchak*, 2012 WL 1078842, at *1 (M.D. Pa. 2012). The convictions and sentences of Cordaro and Munchak were affirmed by the United States Court of Appeals for the Third Circuit on May 31, 2013, but Cordaro's restitution of $98,856.00 was remanded for a determination of whether two Lackawanna County vendors, Highland Associates and Mark Boriosi, had conspired with Cordaro to defraud the United States by evading payment of taxes, as required to impose restitution for their illegal payments pursuant to 18 U.S.C. 3663(a)(1)(A) and 18 U.S.C. § 3663A. *U. S. v. Munchak*, 527 Fed Appx. 191, 196-198 (3d Cir. 2013).

2. Section 2919 of the HRC & OPL states that "[w]ithin the limits of the appropriations and other public and privately contributed funds and services made available to it, the commission may appoint one or more consultants...to serve at the pleasure of the commission and may fix reasonable compensation therefor to be paid the consultants...." 53 Pa.C.S. § 2919(b).

Commission's next public hearing on December 5, 2013, a citizen inquired as to the status of "the investigation of the so-called Day Care Center, the Visitors Center," and was advised by the Commission's counsel that the Commission was "two to three weeks into it and...in the information gathering stage," and that the investigation was "going well." (Transcript of Lackawanna County Government Study Commission Public Hearing on 12/5/13, filed as docket entry no. 32, at pp. 82-84). The Commission's previous retention of Seidel on November 26, 2013, was not mentioned by the Commission at that public hearing or the Commission's subsequent hearing on December 16, 2013. (Transcript of Lackawanna County Government Study Commission Hearing on 12/16/13, filed as docket entry no. 35, at pp. 2-106).

The Commission's counsel did report at the Commission's hearing on January 8, 2014, that "an invoice from Seidel Investigations and Consulting...in the amount of $10,000.00" had "been paid by Mr. Volpe and his company, Excalibur," and that "[Volpe] is not seeking reimbursement on that" invoice. (Transcript of Lackawanna County Government Study Commission Hearing on 1/8/14, filed as docket entry no. 34, at pp. 22, 27). The Commission's counsel also reported that Seidel's review was "still in the investigative process, but we fully anticipate by the end of February, beginning of March," to have Seidel's report "in written form for review by the Commission and the public." (*Id.* at pp. 40-41).

Volpe announced during the Commission's next public hearing on January 15, 2014, that the Commission had retained Seidel, a retired "twenty-six year special agent of the FBI," to conduct "this investigation" into Lackawanna County "contracts that are in place at the [Lackawanna County] Recycling Center,...the [Wilkes-

Barre/Scranton International] Airport,...the [Lackawanna County] Stadium Authority, and the [Pennsylvania Northeast Regional] Railroad Authority," and "[w]hat's going on at the [Lackawanna County] Prison." (Transcript of Lackawanna County Government Study Commission Public Hearing on 1/15/14, filed as Docket entry no. 33, at pp. 21-22). Volpe stated that the Commission had hired "the best person available to report to this Commission, which will then be turned over to the public on what [Seidel's] findings are." (*Id.* at p. 21). At the same meeting, the Commission's secretary, Giannetta, confirmed "that even if the voters were to decide [on May 20, 2014] that there wouldn't be any change and it would keep the three Commissioner form of government, the public should have the information as to what is in [Seidel's] report." (*Id.* at p.32).

On February 17, 2014, the Commission formally issued and unanimously adopted its "final report and recommendations for an Executive-Council Optional Plan of County Government" in compliance with Section 2921 of the HRC & OPL, 53 Pa.C.S. § 2921. (Transcript of Lackawanna County Government Study Commission Hearing on 2/17/14, filed as docket entry no. 38, at pp. 55-58). In its 21-page, single-spaced "report of findings and recommendations," the Commission made no reference to Seidel or his investigation which had commenced on November 26, 2013. (Docket entry no. 37, at pp. 1-21). However, in the required attestation signed by the Commission's members "listing in detail the funds, goods, materials and services, both public and private, used by the commission in the performance of its work and the preparation and filing of the report," 53 Pa.C.S. § 2921(b), the Commission identified the $10,000.00 "Retainer" that Volpe had paid to Seidel on November 26, 2013. (*Id.*, Exhibit D at p. 6 of 6).

Seventy-eight days after the Commission issued and adopted its final "report of findings and recommendations," Seidel provided his report to the Commission on May 6, 2014. (Docket entry no. 10, Exhibit B). "Seidel conducted approximately 50 interviews of individuals who provided varying degrees of information about Lackawanna County government," but his "report contains no references, of any kind or nature, to the identity of the persons interviewed." (Docket entry no. 17 at p. 4). "In addition to the report itself, Mr. Seidel compiled four binders of written records and materials in support of his report," which documents he also furnished to the Commission. (*Id.* at n. 2). "With regard to a section [in the binders] dealing with the Wilkes-Barre/Scranton Airport, Mr. Seidel authored 5 paragraphs of sensitive commentary which was never disclosed to the Commission or to the public." (*Id.*).

In his report, Seidel stated that he "performed a limited review," and that his "limited review identified several areas that we believe should be subjected to a more comprehensive review and, in certain instances, investigation regardless of the form of government selected by County taxpayers." (Seidel Exhibit 1 at p. 1). Seidel's report provides a general overview of the County's finances, indebtedness, pension plan, health insurance expenses and real estate tax collections. (*Id.* at pp. 3-14). The report also contains a brief discussion of the operations of the County Stadium Authority and Transit System Authority. (*Id.* at pp. 19-22, 26-27).

The bulk of the Seidel report is devoted to examination of: the County's lease and child care agreements with Hildebrandt Learning Center, (*Id.* at pp. 14-17, 30-64); the professional service operating agreement between the County Solid Waste Management Authority and Lackawanna Recycling Center, Inc., (*Id.* at pp. 17-19, 65-83); alleged misconduct at the Wilkes-Barre/Scranton

International Airport, (*Id.* at pp. 23-24); six vendors who had admitted making "inappropriate payments to former Commissioners" Cordaro and Munchak and "still perform work for the County and contribute to the current County Commissioner's campaign" committee, (*Id.* at pp. 24-25); an interview of County Commissioner Corey O'Brien by WNEP News regarding his receipt of a campaign contribution in March 2011 from a vendor who had later testified in June 2011 that he made illegal payments to former Commissioner Cordaro, (*Id.* at p. 25 and Attachment C); and the County's agreement with Correctional Care, Inc., to provide health care services to inmates at the Lackawanna County Prison. (*Id.* at pp. 27-28, 83- 98). Seidel's report contains frequent references to remarks made and information provided by unnamed "stakeholders." (*Id.* at pp. 3-4, 6, 12, 15-17, 23-25, 28-29).

Citing unidentified stakeholders who "voiced several concerns with respect to actions of Airport personnel," Seidel's report also mentions "missing parking garage money," "payments made to Airport employees for use of airport facilities," "vendor sponsored employee personnel trips and home remodeling," "employees performing landscaping at an airport official's home," "contractor payment to airport employee," "installation of excess carpeting of (*sic*) an employee's residence," "personnel (*sic*) use of airport vehicles," and "removal of gas and supplies for personnel (*sic*) use." (*Id.* at p. 23). Seidel states in his report that the foregoing "statements rise to a level necessitating an independent investigation by an outside law enforcement agency." (*Id.* at p. 24). In his report's conclusion, Seidel indicates that "[t]he current County Commissioners inherited an operation with massive losses that were pushing the County towards bankruptcy," that it is "apparent that there are no near term resolutions," and that the "County must focus its attention on how to contain

and control salaries, wages and related fringe benefits, in particular, pension and employee health benefits." (*Id.* at p. 29). However, the Seidel report does not include any analysis of the different forms of municipal government, or how another form of government would be more efficient or accountable than the existing form of County government.

On May 15, 2014, Volpe, Giannetta, Seidel and the Commission's counsel met with certain editors and reporters of The Scranton Times to discuss the public release of Seidel's investigative report. (T. P. 10/16/14 at pp. 7-9, 32-33). During that meeting, Volpe and Seidel stated that the Commission would furnish The Scranton Times with a copy of Seidel's report, but would not disclose the identities of the "stakeholders" that Seidel had interviewed. (*Id.* at pp. 15, 21, 30). On May 17, 2014, Borys Krawczeniuk ("Krawczeniuk") of The Scranton Times published an article regarding the Commission's refusal to release the names of the individuals who were interviewed by Seidel. (Lackawanna County Exhibit No. 1). In his report, Krawczeniuk stated that Seidel's report "contains references to some statements by unnamed people Mr. Seidel interviewed, but lacks evidence to support their statements," as a result of which "the newspaper is not publishing it." (*Id.*). Krawczeniuk further reported that "Mr. Seidel and Mr. Volpe refused to identify those interviewed or release supporting documentation, although Mr. Volpe said the backup documentation would be released Wednesday, but not the identities." (*Id.*). Krawczeniuk also quoted Volpe as stating that "turning over everything unredacted to the [Lackawanna County] Commissioners could jeopardize any criminal investigation or subject commission members to prosecution for interfering with an investigation." (T. P. 10/16/14 at p. 25).

The Commission thereafter provided The Scranton

Times with the four binders of Seidel's supporting materials. (T. P. 10/16/14 at p. 12-13, 18; Seidel Exhibit Nos. 2A — 2D). In the portion of one binder entitled "Wilkes-Barre/Scranton International Airport," Seidel redacted five paragraphs which spanned two pages. (Seidel Exhibit 2C, Section 17 at 13-66). In addition, Seidel redacted the identities of the individuals who sent three email communications to him.[3] (Seidel Exhibit 2C, Sections 18 and 22).

On the date of the municipal primary election during which the electorate voted on the Commission's referendum for the adoption of an executive-council optional plan of county government, the Commission conducted its final public meeting.[4] The primary topics of discussion at that meeting were the public disclosure of Seidel's report and the Commission's resolution authorizing Seidel to forward his findings to law enforcement and to provide The Scranton Times with his report after "he redacts the

_____

3. Seidel testified during the evidentiary hearing on October 16, 2014, that he had redacted the names of the individuals who forwarded two emails to him. (T. P. 10/16/14 at pp. 89-90). However, a review of Seidel's binder no. 3, which was marked for identification purposes as Seidel Exhibit 2C, reflects that the sender's names were redacted from three emails. The first email is dated February 4, 2014, with a subject heading "16 Link" and forwards, *inter alia*, the electronic hyperlink for an interview of Lackawanna County Commissioner Corey O'Brien by WNEP-TV on June 24, 2011. (Seidel Exhibit 2C, Section 18). The second redacted email is dated February 5, 2014, and contains a subject header "Corey O'Brien." (*Id.*). The third email is dated April 25, 2014, and bears the subject line "Fix Lackawanna." (Seidel Exhibit 2C, Section 22).

4. Section 2922(a) of the HRC & OPL provides that "[t]he government study commission shall be discharged upon the filing of its report, but if the commission's recommendations require further procedure in the form of a referendum on the part of the electors, the commission shall not be discharged until the procedure has been finally concluded." 53 Pa.C.S. 2922(a). Inasmuch as the referendum recommendation by the Commission was submitted to the electorate on May 20, 2014, the Commission was officially discharged upon the conclusion of that primary municipal election.

stakeholders' references." (Transcript of Lackawanna County Government Study Commission Hearing on 5/20/14, filed as docket entry no. 36, at pp. 26-27). The Commission's counsel stated that Seidel "understands that as a public body, [the Commission's] report is a public document, including the information that compiles the report," while Volpe noted that Seidel had "made it clear that certain confidential stakeholders, as they're referred to in [Seidel's] report," had been promised "anonymity in that a number of them were county employees that had come forward." (*Id.* at pp. 7, 12). Volpe and Giannetta indicated that because Seidel's report was going to be furnished to law enforcement authorities, the Commission members were concerned that they could be charged with hindering apprehension or prosecution, 18 Pa.C.S. § 5105, and obstruction of justice, 18 Pa.C.S. §5101, if they identified those "confidential stakeholders" by name and those individuals were "pressure[d]" or documents were "destroyed" as a result. (*Id.* at pp. 7, 16-17, 20, 26-27).

The Commission's counsel clarified that the Commission was not claiming that information revealing the names of the stakeholders who were interviewed by Seidel "is not part of the report and is not public," but instead maintained that "it's just simply not public at this particular time." (*Id.* at pp. 12-13). Volpe reiterated that if law enforcement authorities declined to prosecute, the identities of those individuals "will be revealed." (*Id.* at p. 16). Giannetta likewise confirmed that the Commission merely wished to "give some time to law enforcement to be able to investigate any of these findings and determine whether they should be prosecuted," with the understanding that "eventually at some point everything needs to be turned over to the public. (*Id.* at p. 21).

Consequently, the Commission's counsel stated that Seidel was "going to, for lack of a better term, redact

the information relative to the stakeholders so that that information will remain unknown at this time except to law enforcement..." (*Id.* at p. 13). Volpe represented that if law enforcement authorities chose to prosecute any individuals based upon Seidel's report, the identities of the "confidential stakeholders' would be disclosed in any indictment or presentment filed by the prosecutors. (*Id.* at p. 22). However, if no criminal prosecutions resulted, Volpe announced that "at that point all information would be released to the public." (*Id.* at p. 21). Following that discussion, the Commission unanimously passed a resolution authorizing "Seidel to turn over his findings, the full and complete findings, to law enforcement with the proviso that when he redacts the stakeholders' references, the rest of his report will be turned over to The Scranton Times and made public...." (*Id.* at pp. 26-27).

On May 20, 2014, the Lackawanna County electorate did not approve the Commission's referendum question for the adoption of the executive-council optional plan of county government. (Lackawanna County Exhibit No. 2). On June 4, 2014, the Commission delivered its records, reports, minutes and other materials to the Lackawanna County Commissioners Office in accordance with Section 2921(d) of the HRC & OPL. (Docket entry no. 19, Exhibit D). On that same date, Krawczeniuk and The Scranton Times, L.P. d/b/a The Times-Tribune ("The Scranton Times"), submitted a right-to-know request to the Commission seeking "an unredacted copy of the report compiled by Seidel Investigations & Consulting, Inc., including the names of stakeholders who provided information to the commission and whose names were either not mentioned in the report or whose names were concealed through active redacting of the report." (Docket entry no. 19, Exhibit A; T. P. 10/16/14 at p. 18).

On June 6, 2014, the Lackawanna County Solicitor

forwarded correspondence to the Commission's counsel stating that the HRC & OPL "does not provide the former commission with the authority to redact and withhold records," and demanding that the Commission provide Lackawanna County with "[t]he unredacted and verified copy of the 'investigation' report conducted by the Seidel Agency at the behest of the commission" in fulfillment of the Commission's duty under 53 Pa.C.S. § 2921(d). (Docket entry no. 19, Exhibit D). On the same day, the Commission's counsel responded to The Scranton Times' request, and stated that the Commission had "turned over all records regarding the report compiled by Seidel Investigations & Consulting, Inc., to Lackawanna County in accordance with the Pennsylvania Home Rule Charter and Optional Plans Law." (Docket entry no. 19, Exhibit B). The Commission's counsel further indicated that neither the Commission members nor its counsel were furnished "with an unredacted copy of the Seidel Investigations & Consulting, Inc., performance audit report" and did not "have any knowledge of the identities of stakeholders contained therein." (*Id.*). He also stated that Seidel "did not provide unredacted information to the Study Commission under the premise that confidential sources and audit work papers are exempt from disclosure" under Section 708(b)(17)(iii) and (v) of the RTKL.[5] (*Id.*). Based upon that reasoning, the Commission denied The Scranton Times' right-to-know request. (*Id.*).

On June 12, 2014, The Scranton Times filed a RTKL appeal with the Office of Open Records ("OOR")

---

5. Section 708(b) of the RTKL identifies records which "are exempt from access by a requester," and in subparagraph (17) lists "[a] record of an agency relating to a noncriminal investigation, including...(iii) [a] record that includes the identity of a confidential source, including individuals subject to the act of December 12, 1986 (P.L. 1559, No. 169), known as the Whistleblower Law," and "[w]ork papers underlying an audit." 65 P.S. § 67.708(b)(17)(iii), (v).

challenging the Commission's denial on the grounds that: (1) the Commission "has a duty to obtain the report as a public record and produce same" to The Scranton Times; (2) the Commission "had no legislatively granted investigative powers, and the [Seidel] report was simply the result of the [Commission's] unilateral, one-time inquiry into selected functions of the county government;" and (3) Seidel's investigative materials are "not protected from disclosure under the RTKL."[6] (Docket entry no. 19, Exhibit C). The Lackawanna County Solicitor also forwarded a letter to Seidel on June 12, 2014, making "a formal demand by the County of Lackawanna for the unredacted copy" of Seidel's report, and advising Seidel that since his "company was acting on behalf of, and at the behest of, the former Study Commission," his materials were required to be furnished to Lackawanna County under Section 2921(d) of the HRC & OPL. (Docket entry no. 19, Exhibit F). Upon receiving that letter, Seidel contacted the Commission's counsel who advised Seidel that he should retain private counsel. (T. P. 10/16/14 at p. 82). On June 18, 2014, Seidel's counsel replied to Lackawanna County's demand for Seidel's investigative records, and asserted that the HRC & OPL and the RTKL are not "applicable to Mr. Seidel" since "Seidel is neither a public official nor a public employee." (Docket entry no. 19, Exhibit G). Seidel's counsel further stated that the RTKL "specifically exempts from disclosure the type of information" that the County was demanding, and "caution[ed] [the County] that the RTKL specifically provides for court ordered sanctions for frivolous requests or appeals." (*Id.* at p. 2).

---

6. Under the RTKL, a requester may appeal a local agency's denial of a records request to the Office of Open Records, which must designate an appeals officer to receive evidence submitted by the requester and the local agency and thereafter issue "a final determination" within thirty days of receipt of the appeal. *See* 65 P.S. §§67.503(a)(2), 1101-1102.

The OOR "directed the Commission to notify any third parties of their ability to participate in the appeal pursuant to 65 P.S. § 67.1101(c)," which permits such participation by any "person other than the agency or requester with a direct interest in the record subject to an appeal." (Docket entry no. 19, Exhibit L at p. 2). Although the County requested the opportunity to participate under Section 1101(c) of the RTKL, and was granted permission to participate by the OOR, Seidel did not seek to participate in the appeal before the OOR. (*Id.* at p. 4). In its submission to the OOR, the Commission represented that "Seidel has provided the [Commission] with redacted copies of its performance audit report, but has not provided an unredacted copy in adherence to Section 708(b)(17) of the RTKL." (Docket entry no. 19, Exhibit J at p. 4). The Commission further attested that it "has provided a redacted copy of Seidel's performance audit but takes the position that it will not disclose the names of confidential sources under Section 708(b)(17) of the RTKL which exempts disclosure of a record of an agency related to a non-criminal investigation, including (iii) a record that includes the identity of a confidential source, and (v) work papers underlying an audit." (*Id.*).

On July 10, 2014, the OOR issued its final determination granting The Scranton Times' appeal and directing the Commission "to provide an unredacted copy of the [Seidel] report within thirty (30) days." (Docket entry no. 19, Exhibit L at p. 10). The OOR reasoned that the Commission is required to provide public access to any public records within its actual or constructive possession or control. (*Id.* at p. 6). Finding that "the Commission cannot attest to what the redacted information contains as it was never provided an unredacted copy of the [Seidel] report," the OOR concluded that the Commission had not satisfied "its burden of proof that the redacted information

is exempt." (*Id.* at p. 9).

On August 8, 2014, the Commission filed the instant petition for review under 65 P.S. § 67.1302. (Docket entry no. 1). A scheduling order was issued on August 22, 2014, establishing deadlines for the filing of petitions to intervene, supporting and opposing briefs and witness/exhibit lists, and scheduling this matter for an evidentiary hearing and oral argument on October 16, 2014. (Docket entry no. 4). Seidel and Lackawanna County filed petitions to intervene, (Docket Entry Nos. 10, 12), and were both granted leave of court to intervene. (Docket entry no. 13).

The Commission contends on appeal that it "clearly possesses the statutory authority under the Home Rule Law to conduct a noncriminal investigation in advancement of one of its primary goals of studying the existing form of government in Lackawanna County in an effort to make its statutorily prescribed recommendations under the Home Rule Law." (Docket entry no. 15 at p. 5). The Commission posits that Seidel obtained information from "individual stakeholders" on the "condition of confidentiality," and that "[t]heir testimony and information w[ere] instrumental in providing the [Commission] with information that allowed the commissioners to make their recommendations to the public within the statutorily prescribed time." (*Id.*, at p. 7). The Commission represents that "Seidel's report was also submitted to law enforcement officials as the testimony by several of the confidential stakeholders and investigative findings uncovered potential criminal activity." (*Id.*). While the Commission concedes that any materials in Seidel's possession are deemed public records of the Commission under 65 P.S. § 67.506(d)(1), (Docket entry no. 8 at ¶22), it contends that those documents are nonetheless exempt from disclosure under 65 P.S. § 67.708(b)(17)(iii) and (v). (Docket entry no. 15 at pp. 11-12).

In light of the Commission's representation that Seidel's report has been furnished to "law enforcement officials," an order was served upon the United States Attorney for the Middle District of Pennsylvania and the Lackawanna County District Attorney, inviting them to submit *amicus curiae* briefs on or before October 16, 2014, "with respect to the discoverability of the foregoing report of Seidel Investigation & Consulting, Inc., which was reportedly 'also submitted to law enforcement officials.'" (Docket entry no. 28). *See In re County Investigating Grand Jury VIII, 2003*, 2005 WL 4807444 (Lacka. Co. 2005) (Attorney general for the Commonwealth of Pennsylvania invited to file, and did later file, an *amicus curiae* brief on issue of whether district attorney had a conflict of interest in prosecuting Lackawanna County prison guards since district attorney was statutorily required to serve as a member of the county prison board), *aff'd*, No. 29 MM 2005 (Pa. April 15, 2005). By letter dated October 15, 2014, the United States Attorney for the Middle District of Pennsylvania advised the undersigned that "[t]he United States Attorney has no interest concerning the discoverability of said report" and, therefore, "respectfully declines the court's invitation to submit a brief in this appeal." (Docket entry no. 39). The Lackawanna County District Attorney did not file a brief or other submission regarding the discoverability of Seidel's records by The Scranton Times or Lackawanna County.

Seidel submits in his brief that the parties' references to a "redacted report" and an "unredacted report" are "inaccurate" since "Seidel has authored one report, and one report only" which "does not identify the persons interviewed." (Docket entry no. 17 at p. 4). Invoking the same statutory exceptions cited by the Commission, Seidel asserts that he is exempt "from disclosing to [The Scranton Times] or anyone else the identity of any

confidential sources interviewed" by him. (*Id.* at pp. 5, 7). Seidel also premises his exemption argument upon Section 708(b)(17)(ii) of the RTKL, which excepts from public disclosure any "[i]nvestigative materials, notes, correspondence and reports" relating to a non-criminal investigation. (*Id.* at p. 5).

The Scranton Times argues "that the Commission did not have any legislatively granted power to conduct any noncriminal investigations" or a "performance audit." (Docket entry no. 18 at p. 5). It further avers that since Seidel's report post-dated the Commission's adoption of its final report and recommendations, Seidel's "untimely limited review served no legitimate purpose" other than "the purpose of politics" and an attempt to influence the electorate's vote on the Commission's recommended change in the form of government. (*Id.* at pp. 5, 6). However, "[s]ince the Commission took it upon itself to conduct an unofficial limited review under the color of the agency," The Scranton Times submits that "any information gathered [by Seidel] is subject to disclosure under the RTKL." (*Id.* at p. 6). Finally, The Scranton Times notes "that Seidel had no authority to promise confidentiality to any person interviewed while he was acting on behalf of the Commission, and Seidel has not offered any legal authority supporting his alleged power to grant confidentiality." (*Id.* at p. 6).

Relying upon its designation "as the statutory custodian of all records and reports of the [Commission] after it is discharged," Lackawanna County asserts that it has an affirmative "obligation to possess all records and reports" of the Commission, including an "unredacted copy of the Seidel report." (Docket entry no. 19 at pp. 5-6). The County contends that since the Commission admits that any investigative materials within Seidel's control are

deemed records in the custody of the Commission pursuant to Section 506(b)(1) of the RTKL, "the full version of the Seidel report and the identities of the stakeholders, whether in the possession of Seidel Investigation & Consulting, Inc., or the [Commission], are presumed to be public records under the RTKL and subject to disclosure." (*Id.* at p. 8). In that regard, the County argues that the citizens of Lackawanna County "have a statutory right to inspect" all records of the Commission and Seidel, including the identities of the individuals who were interviewed by Seidel. (*Id.* at p. 10).

During the evidentiary hearing on October 16, 2014, Seidel testified that he promised confidentiality to current Lackawanna County employees and other "stakeholders" that he interviewed during his investigation. (T. P. 10/16/14 at pp. 78-80, 104). He stated that the identities of those individuals are not reflected in any written materials prepared by him, and testified that their identities have not been revealed to any Commission member or other person. (*Id.* at pp. 71-72, 76, 89, 100). Seidel also claimed that although the names of the persons that he interviewed were contained in his handwritten notes of the interviews, he destroyed those notes after he placed the information furnished by the "stakeholders" in the "investigative inserts" of the binders.[7] (*Id.* at pp. 70-71, 77, 85-86, 90-

---

7. Based upon Seidel's testimony that his destroyed handwritten notes reflected the identities of the "stakeholders" that he interviewed, and his acknowledgement that he recalls their identities by memory, The Scranton Times argued that Seidel should be directed to recreate the list of those names which he destroyed. (*Id.* at pp. 159-163). The Commission and Seidel responded that The Scranton Times' requested remedy violates Section 705 of the RTKL, which states that "[w]hen responding to a request for access, an agency shall not be required to create record which does not currently exist or to compile, maintain, format or organize a record in a manner in which the agency does not currently compile, maintain, format or organize the record." 65 P.S. § 67.705. The parties were directed to submit supplemental briefs on that narrow issue, (T. P. 10/16/14 at pp. 163-164), but by letter dated October

91, 95, 98-99).

With regard to the redacted identities of the individuals who forwarded emails to Seidel on February 4, 2014, February 5, 2014, and April 25, 2014, (*see* n. 3, *supra*), Seidel maintained that his computer "went bad the end of April of this year," and that Seidel was required to have it serviced by T-R Associates. (T. P. 10/16/14 at pp. 88-89). According to Seidel, "Alex at T-R Associates...called [Seidel] and he said listen, we can fix your computer but you're going to lose all of your emails, your data and we're going to have to reprogram everything." (*Id.* at p. 89). With Seidel's consent, T-R Associates performed that service, as a result of which Seidel's emails are reportedly "gone forever" and "it's impossible" to retrieve them. (*Id.*).

Seidel confirmed that he provided his report and supporting materials to the "FBI only," but stated that he has not furnished the FBI with the names of the interviewees, nor has the FBI requested their names. (*Id.* at pp. 71-72, 105). Seidel contacted the FBI prior to the evidentiary hearing on October 16, 2014, to discuss the instant right-to-know dispute, and was advised by the FBI that it has no objection to the release of Seidel's unredacted work papers currently being requested by The Scranton Times. (*Id.* at pp. 47-48, 75). Finally, Seidel attested that he merely conducted a "one-time inquiry" for the Commission and has not performed any additional investigations on its behalf. (*Id.* at p. 106).

Volpe and Giannetta testified that neither they nor any other Commission members are aware of the identities

23, 2014, The Scranton Times formally withdrew its "contention that the Court may possibly have the power pursuant to the RTKL to order...Seidel Investigation to recreate the list of stakeholders which he destroyed prior to the filing of our RTKL request." (Docket entry no. 41).

of the "stakeholders" who were interviewed by Seidel. (*Id.* at pp. 107-108, 129-130, 154). Volpe and Giannetta acknowledged that the Commission did not consider or rely upon Seidel's investigation or report when the Commission issued and adopted the final report of its findings and recommendations on February 17, 2014. (*Id.* at pp. 115, 155). Volpe and the Commission's counsel stated that their "choice of words, in hindsight, could have been better," in that the Commission should have used the word "omit" rather than "redact" when referring to the fact that the stakeholders' identities would not be included in Seidel's report and supporting materials. (*Id.* at pp. 41-42, 118, 133-134, 141-142, 144, 146).

In response to Seidel's contention that the emails which he received from certain stakeholders "were obliterated" by T-R Associates and "can't be retrieved," the undersigned stated that "the email, even if deleted, can be retrieved" since its still "exist[s] in some type of an electronic format that could then be printed." (*Id.* at pp. 65-66). Counsel for Lackawanna County also asserted that although Seidel's "hard drive might be obliterated" on his computer, the emails remain electronically stored on and retrievable from his "Frontier [email] server." (*Id.* at pp. 65-66, 174-175). Seidel's counsel replied that there was no evidence in the record supporting the conclusion that Seidel's deleted emails can be retrieved, and he alleged that Lackawanna County's counsel was "just making it up as he goes." (*Id.* at pp. 175-176). Since the parties' conflicting digital arguments do not involve a matter which may be judicially noticed under Pa.R.E. 201, Leonard Deutchman, Esquire, of LDiscovery was retained as a technical advisor to the court on October 29, 2014, in order to furnish an expert opinion on the issue of whether Seidel's deleted emails can be retrieved from Frontier's email server. (Docket entry no. 42).

In his expert report that was received on November 3, 2014, Mr. Deutchman provided his "expert opinion that the emails in question could be recovered either from the hard drive of Mr. Seidel's computer or from Frontier Internet Service." (Docket entry no. 44 at p. 2). Mr. Deutchman stated that "[i]f Mr. Seidel has a free account" with Frontier, his "email retention is bounded by a size of the mailbox given to him," and under the "calculus" used by internet service providers, "the oldest email is pushed out when the newest arrives." (*Id.*). Seidel would "have a larger mailbox" if he "has a pay account," and if that larger mailbox "does reach capacity, emails will most likely be purged in the same manner." (*Id.*). In either event, the emails from early February 2014 and late April 2014 could be obtained from Frontier Internet Service via a subpoena or other court directive. (*Id.*).

Mr. Deutchman opined that, in the alternative, the emails in question may be retrieved from Seidel's hard drive. If Seidel's computer experienced a "logical" failure, T-R Associates would have repaired the computer by "install[ing] a new operating system and all applications," in which event the "emails on the hard drive could still be recoverable." (*Id.* at p. 3). Conversely, if Seidel's computer experienced a "physical" failure, T-R Associates would have "completely replaced the hard drive," and "recovery of the email from a brand new hard drive would be impossible since none of the email was copied to it." (*Id.*). Nevertheless, if the hard drive was replaced due to a physical error, "and if the old drive is still accessible, it can be sent to a drive recovery specialist who can attempt to recover all of the [electronically stored information] ESI on the drive." (*Id.*).

In short, Mr. Deutchman concluded that the emails in dispute could be secured from Frontier Internet Service or Seidel's hard drive. (*Id.* at pp. 2-3). On October 31,

2014, the Commission and Seidel voluntarily provided The Scranton Times with the redacted five paragraphs of Seidel's "sensitive commentary" on the Wilkes-Barre/Scranton International Airport, in exchange for The Scranton Times' agreement not to amend its pleading in this matter to seek the recovery of counsel fees based upon Seidel's belated disclosure of his earlier destruction of his handwritten notes reflecting the stakeholders' identities. (Docket entry no. 43). In light of Seidel's apparent destruction of his handwritten notes, and the voluntary production of his redacted commentary concerning the Wilkes-Barre/Scranton International Airport, the only remaining issue to be decided is the discoverability of the redacted content of the three emails in question. With the benefit of the foregoing factual background, the merits of the parties' RTKL arguments will be addressed.

## II. DISCUSSION

### (A) STANDARD AND SCOPE OF REVIEW

'"Standard of review' and 'scope of review,' although distinct, are not concepts that are considered in isolation from one another." *Bowling v. Office of Open Records*, 621 Pa. 133, 170, 75 A.3d 453, 475 (2013). "Scope of review" refers to the confines within which a reviewing court must conduct its examination, "or to the matters (or 'what') the [reviewing] court is permitted to examine." *Samuel-Bassett v. Kia Motors America, Inc.*, 613 Pa. 371, 407, 34 A.3d 1, 21 (2011), *cert. denied*, 133 S. Ct. 51 (U.S. 2012). "Standard of review" concerns the manner in which (or "how") that examination is to be conducted. *Holt v. 2011 Legislative Reapportionment Commission*, 614 Pa. 364, 392, 38 A.3d 711, 728 (2012); *Mid Valley School District v. Warshawer*, 2013 WL 5234308, at *4 (Lacka. Co. 2013).

Section 1302(a) of the RTKL addresses the manner in which a common pleas court must consider a petition for review involving a "local agency," and states that the decision of the court "shall contain findings of fact and conclusions of law based upon the evidence as a whole" and "shall clearly and concisely explain the rationale for the decision." 65 P.S. § 67.1302(a). In 2013, the Supreme Court of Pennsylvania clarified the appropriate standard of review under 65 P.S. § 67.1302, and concluded that the common pleas courts "are the ultimate finders of fact and that they are to conduct full *de novo* reviews of appeals from decisions made by the RTKL appeals officers, allowing for the adoption of the appeals officer's factual findings and legal conclusions when appropriate." *Bowling*, 621 Pa. at 168-169, 75 A.3d at 474; *Kelly v. Northeastern Educational Intermediate Unit*, 2014 WL 926273, at *5 (Lacka. Co. 2014).

As for the scope of review, Section 1303(b) of the RTKL provides that the record on appeal before a common pleas court "shall consist of the request, the agency's response, the appeal filed under section 1101, the hearing transcript, if any, and the final written determination of the appeals officer." 65 P.S. § 67.1303(b). However, Section 1303(b) does not restrict the scope of the record on appeal, and instead simply describes the record to be certified by the OOR to the reviewing court. As a consequence, the "scope of review" is plenary and permits trial courts "to expand their record to fulfill their statutory role" as fact-finders and thereby consider matters beyond the record that is certified by the OOR. *Bowling*, 621 Pa. at 173, 75 A.3d at 476. Accordingly, the "standard of review is *de novo* and [the] scope of review is broad or plenary when [a court] hears appeals from determinations made by appeals officers under the RTKL." *Id.* at 173, 75 A.3d at 477.

(B) APPLICABLE BURDEN OF PROOF

Section 302(a) of the RTKL obligates all local agencies to provide public access to "public records," 65 P.S. § 67.302(a), and the parties in this appeal stipulate that the Commission was a "local agency," which is defined as "[a]ny local,...or municipal...commission or similar governmental entity." 65 P.S. § 67.102. The objective of the RTKL "is to empower citizens by affording them access to information concerning the activities of their government." *SWB Yankees LLC v. Wintermantel*, 615 Pa. 640, 662, 45 A.3d 1029, 1042 (2012). Act 3 of February 14, 2008, made significant changes to right-to-know law in Pennsylvania, which resulted in "a dramatic expansion of the public's access to government documents." *Levy v. Senate of Pennsylvania*, 619 Pa. 586, 618, 65 A.3d 361, 381 (2013); *Warshawer, supra*, at *5. The prior version of the RTKL placed "[t]he burden of establishing that requested material bears characteristics of a public record...upon the party seeking access." *LaValle v. Office of General Counsel*, 564 Pa. 482, 497, 769 A.2d 449, 458 (2001). "Under the new law, agency records are presumed to be public records, accessible for inspection and copying by anyone requesting them, and must be made available to a requester unless they fall within specific, enumerated exceptions or are privileged." *Bowling v. Office of Open Records*, 621 Pa. 133, 140, 75 A.3d 453, 457 (2013). The current RTKL also expands the definition of a "public record" to include the records of an independent, third party contractor with whom the agency has contracted to perform a non-ancillary governmental function on behalf of the agency, provided that the requested records directly relate to that function. *SWB Yankees*, 615 Pa. at 662-663, 45 A.3d at 1042-1043 (discussing 65 P.S. § 67.506(d)(1)).

Pursuant to Section 708(a)(1) of the RTKL, 65 P.S. § 67.708(a)(1), the agency bears the burden of proving, by a preponderance of the evidence, that a record is exempt

from public access. *Com., Office of Open Records v. Center Township*, 95 A.3d 354, 358 (Pa. Cmwlth. 2014); *Pennsylvania State Police v. McGill*, 83 A.3d 476, 479 (Pa. Cmwlth. 2014) (*en banc*). These notable changes to the RTKL "demonstrate a legislative purpose of expanded government transparency through public access to documents." *Barnett v. Pennsylvania Department of Public Welfare*, 71 A.3d 399, 403 (Pa. Cmwlth. 2013). As a result, "courts should liberally construe the RTKL to effectuate its purpose of promoting 'access to official government information in order to prohibit secrets, scrutinize actions of public officials, and make public officials accountable for their actions.'" *Levy*, 619 Pa. at 618-619, 65 A.3d at 381 (quoting *Allegheny County Dept. of Admin. Services v. A Second Chance, Inc.*, 13 A.3d 1025, 1034 (Pa. Cmwlth. 2011)).

(C) NONCRIMINAL INVESTIGATION EXEMP-TION

The RTKL requires an agency to provide any citizen access to any "public record," which is defined as any "record" that is not (a) exempt from disclosure under 65 P.S. §67.708 or any other federal or state law or regulation or judicial order of decree, or (b) protected by some privilege. 65 P.S. § 67.102. The term "record" includes any "document, paper,...tape,...or..., information stored or maintained electronically and a data-processed or image-processed document." *Id.* The Commission and Seidel contend that the material sought by The Scranton Times and Lackawanna County is exempt from disclosure by Section 708(b)(17) of the RTKL which states, in pertinent part, that the RTKL does not require production of:

(17) A record of an agency relating to a noncriminal investigation, including:

\* \* \*

(ii) Investigative materials, notes, correspondence and reports.

(iii) A record that includes the identity of a confidential source, including individuals subject to the act of December 12, 1986 (P.L. 1559, No. 169) known as the Whistleblower Law.

\* \* \*

(v) Work papers underlying an audit.

65 P.S. § 67.708(b)(17)(ii) — (iii), (v).

As noted above, "[t]he agency bears the burden of proving that a record is exempt from public access." *McGill*, 83 A.3d at 479 (citing 65 P.S. § 67.708(a)(1)). The Commission and Seidel must establish the applicability of the "noncriminal investigation" exemption by "a preponderance of the evidence," which "is such proof as leads the fact-finder to find that the existence of a contested fact is more probable than its nonexistence." *Pennsylvania State Troopers Association v. Scolforo*, 18 A.3d 435, 439 (Pa. Cmwlth. 2011); *Kelly, supra*, at \*8. It is axiomatic that "[e]xemptions from disclosure must be narrowly construed due to the RTKL's remedial nature...." *Clinkscale v. Department of Public Welfare*, 2014 WL 4960137, at \*2 (Pa. Cmwlth. 2014); *Warshawer, supra*, at \*7.

To qualify for any one of the three claimed exemptions, the Commission and Seidel must first demonstrate that the records sought relate to a "noncriminal investigation." The RTKL does not define the terms "noncriminal" and "investigation." *Pennsylvania Public Utility Commission v. Gilbert*, 40 A.3d 755, 759 (Pa. Cmwlth. 2012). In

*Department of Health v. Office of Open Records*, 4 A.3d 803 (Pa. Cmwlth. 2010), the Commonwealth Court held that "the word 'noncriminal' in Section 708(b)(17) is intended to signal that the exemption is applicable to investigations other than those which are criminal in nature." *Id.* at 810. The court further concluded that the word "investigation" in Section 708(b)(17) "means a systematic or searching inquiry, a detailed examination, or an official probe." *Id.* at 810-811; *accord Heavens v. Pennsylvania Department of Environmental Protection*, 65 A.3d 1069, 1074 (Pa. Cmwlth. 2013). To constitute "a systematic or searching inquiry" or a "detailed examination," the investigation cannot be "a one-time inquiry" and must instead involve "comprehensive, repeated," and "regular" examinations or inspections. *Department of Public Welfare v. Chawaga*, 91 A.3d 257, 259 (Pa. Cmwlth. 2014).

To be eligible for the "noncriminal investigation" exemption under Section 708(b)(17), the agency must, as a threshold matter, possess the authority to conduct the investigation at issue. *Compare Chawaga*, 91 A.3d at 259 (noncriminal investigation exemption did not preclude disclosure of DPW performance audit report since "DPW's performance audit was not part of the DPW's legislatively granted fact-finding or investigative powers.") *and Coulter v. Department of Public Welfare*, 65 A.3d 1085, 1089-1090 (Pa. Cmwlth. 2013) (records pertaining to DPW's official probe of county Children & Youth Services (CYS) fell within noncriminal investigation exemption since DPW possessed statutory and regulatory authority to investigate children and youth social service agencies, and its investigation was carried out pursuant "to DPW's duty to investigate complaints to determine whether an agency is compliant with applicable laws and its power to compel acceptable plans of correction."). "Agencies are creatures of statute and, thus, only have the authority to

act pursuant to their official duties as established by their enabling legislation." *Sherry v. Radnor Township School District*, 20 A.3d 515, 523 (Pa. Cmwlth. 2011) (quoting *Department of Health*, 4 A.3d at 814), *app. denied*, 612 Pa. 710, 31 A.3d 292 (2011). "As such, in order for an agency to conduct any type of investigation, the investigation would necessarily be a part of the agency's official duties." *Department of Health*, 4 A.3d at 814. *See also Johnson v. Pennsylvania Convention Center Authority*, 49 A.3d 920, 925 (Pa. Cmwlth. 2012) (noncriminal investigation exception is "applied to preclude disclosure of materials related to noncriminal investigations conducted by an agency acting within its legislatively-granted fact-finding and investigative powers."); *Gilbert*, 40 A.3d at 759-760 (noncriminal investigation exemption applied to Public Utility Commission (PUC) investigation of probable violations and pipeline incidents reported by pipeline operators, inasmuch as the PUC was required to conduct "the inspection/investigations to determine if the utilities are in compliance with the Public Utility Code, the [Pipeline and Hazardous Materials Safety Administration] PHMSA and other applicable state and federal regulations.").

(1) Government Study Commission's Official Duties Under HRC & OPL

The authority of a government study commission is circumscribed by its enabling legislation, the HRC & OPL. Section 2918 of the HRC & OPL, entitled "Function and duty of commission," states that a "government study commission shall study the form of government of the municipality to compare it with other available forms under the laws of this Commonwealth and determine whether or not in its judgment the government could be strengthened or made more clearly responsible or accountable to the people or whether its operation could

become more economical or efficient under a changed form of government." 53 Pa.C.S. § 2918. Pursuant to Sections 2921 and 2923, the "government study commission shall report and recommend" to the electorate that either (a) the form of government remain unchanged, or (b) a referendum question be submitted to the electors to adopt "a home rule charter" or "one of the optional plans of government authorized" by the HRC & OPL. 53 Pa.C.S. §§2921(a), 2923.

The Commonwealth Court of Pennsylvania has strictly construed the scope of the authority granted to government study commissions under the HRC & OPL. In *Schrier v. Kisselback*, 879 A.2d 834 (Pa. Cmwlth. 2005) (*en banc*), the township government study commission recommended the adoption of an optional plan form of government in which the Council members would be limited to two consecutive terms of office. *Id.* at 836. After the recommendation was adopted by the electors, the subsequent candidacies of incumbent council members were challenged based upon the recommended implementation of term limits. Relying upon the pronouncement in *Kline v. City of Harrisburg*, 362 Pa. 438, 68 A.2d 182 (1949) that local governments "are not sovereigns" and can only exercise the powers granted to them, the trial court in *Schrier* declared the term limitations invalid since the relevant statutes, including the HRC & OPL, "contain no express authorization for term limits, and grant no other express power from which authority could be inferred to establish term limits." *Schrier*, 879 A.2d at 837. On appeal, an *en banc* panel of the Commonwealth Court adopted "the well-reasoned opinion" of the trial court, and agreed "that the [government study] Commission had no statutory authority to recommend the establishment of term limits in the optional plan and, therefore, the voters in the Township could not have adopted such limits." *Id.* at 838.

The plain language of the HRC & OPL clearly states that the duties of a government study commission are to study the existing form of government, to compare it with other available forms of government, and to determine whether the existing form of government could be strengthened or made more responsible, accountable, economical or efficient under a different form of government.[8] *See* 53 Pa.C.S. § 2918. In its only official public action authorizing the investigation at issue, the Commission unanimously passed a motion directing its counsel to investigate (1) the County's lease agreement with Hildebrandt Learning Center, (2) whether any vendors who admitted "bribing" former County Commissioners Cordaro and Munchak continue to "do[] business with the county," and (3) whether any of those vendors are "still contributing to the current Commissioners' campaigns." (Docket entry no. 30 at pp. 83-88). While not the subject of a formal vote by the Commission at the time, Volpe also instructed the Commission's counsel at the hearing on November 13, 2013, to "turn that information over to the appropriate law enforcement authorities" if there was "probable cause" of possible criminal wrongdoing. (*Id.* at pp. 95-97).

The Commission's counsel later executed a contract with Seidel to conduct that investigation, pursuant to the Commission's power to appoint consultants under 53 Pa.C.S. § 2919(b). During the Commission's 14th public hearing on January 15, 2014, the scope of Seidel's investigation was expanded, albeit without any formal vote by the Commission, to probe "contracts that are

---

8. In addition to a home rule charter government, the other optional forms of government authorized by the HRC & OPL include the Executive (Mayor)-Council Plan A, 53 Pa.C.S. §§ 3001-3018, Executive (Mayor) — Council Plan B, 53 Pa.C.S. §§ 3031-3033, Executive (Mayor)-Council Plan C, 53 Pa. C.S. §§ 3041-3043, Council-Manager Plan, 53 Pa.C.S. § 3051-3064, Small Municipality Plan, 53 Pa.C.S. §§ 3071-3080, and Optional County Plan, 53 Pa.C.S. §§ 3091-3095.

in place at" the County's Recycling Center, Stadium Authority, Railroad Authority and Prison, as well as the operations at the Wilkes-Barre/Scranton International Airport. (Docket entry no.33 at pp. 21-22). In his report dated May 6, 2014, Seidel examined the County's child care center agreements with Hildebrandt Learning Center, the six vendors who had admitted making illegal payments to former Commissioners Cordaro and Munchak, and the contributions that those vendors had made since 2008 to a current County Commissioner's campaign committee, as per the Commission's directive on November 13, 2013. Additionally, Seidel scrutinized the existing contractual arrangements and activities at the County's Recycling Center, Stadium Authority and prison and the Wilkes-Barre/Scranton International Airport. In the Seidel report's sole references to the "the form of government" existing or potentially available in Lackawanna County, Seidel stated that "County government regardless of its form will face the enormous task of improving profitability through a combination of revenue increases and expense reduction while dealing with a burdensome level of long-term debt," and identified certain issues which "should be subjected to a more comprehensive review, and in certain instances, investigation regardless of the form of government selected by County taxpayers." (*Id.* at pp. 1, 29).

Nothing contained in the HRC & OPL vested the Commission, or any consultant retained by the Commission, with the express or implied authority to investigate county contracts and lease agreements, inspect campaign committee reports, or publicly recommend "an independent investigation by an outside law enforcement agency" of unnamed employees of the Wilkes-Barre/Scranton International Airport based upon statements made

by unidentified "stakeholders."[9] Based upon the clear language of the HRC & OPL, the Commission's "official duties" were confined to a study of the County's existing Home Rule Charter form of government, comparison of that Home Rule Charter government with other optional forms of government, and a determination of whether another available form of government would make the county government more responsible, accountable, economical or efficient. Contractual agreements with the county and the county's various authorities, and political contributions to candidates seeking to be elected as governing county officials, will continue to exist, regardless of whether Lackawanna County is governed by its Home Rule Charter or the County Executive-Council form that was recommended by the Commission. Nothing in Seidel's report remotely suggests that the various issues that were investigated by Seidel were somehow attributable to a particular form of government, and neither the Commission nor Seidel had the authority under the HRC & OPL to conduct a formal inquiry into those specific matters.

The three emails, which are the subject of this RTKL

_____

9. In its last official action on May 20, 2014, the Commission formally adopted a resolution directing Seidel to furnish his "full and complete findings to law enforcement," and after "he redact[ed] the stakeholders' references," to provide his report to The Scranton Times and the public. (Docket entry no. 36 at pp. 26-27). The Commission stated that the stakeholders' identities were being withheld in order to afford law enforcement the opportunity to investigate the allegations, and to prevent the Commission members from being chargeable with hindering apprehension or prosecution and obstruction of justice in the interim. (*Id.* at pp. 16-17, 20-21, 26- 27). Seidel confirmed during his testimony that he provided his "full and complete findings" to the FBI only, (T P. 10/16/14 at pp. 71-72), and that the FBI has no objection to the disclosure of the unredacted materials currently being sought by The Scranton Times. (*Id.* at pp. 47-48, 75). The U. S. Attorney for the Middle District of Pennsylvania has similarly confirmed that he has "no interest concerning the discoverability" of the information which The Scranton Times seeks to discover in this RTKL appeal. (Docket entry no. 39).

dispute, likewise do not relate to subjects that were within the "official duties" of the Commission under 53 Pa.C.S. § 2918. The email dated February 4, 2014, references the sender's meeting with Seidel on that date, and forwards "the link to the 'ambush' interview of [Commissioner] Corey O'Brien" that was later discussed in Seidel's report and attached thereto as an exhibit. The email of February 5, 2014, questions the veracity of Commissioner O'Brien's remarks during that interview and the accuracy of the campaign contribution information that was identified by the WNEP-TV reporter. The third email dated April 25, 2014, discusses the tax assessment reduction for a Dunmore property that is leased as office space for the Lackawanna County Coroner. None of the emails concern the form of Lackawanna County government or how a different form of government would avoid those issues or otherwise be more accountable or efficient.

When approving Volpe's petition for the submission of a referendum question for the election of a government study commission on May 21, 2013, we expressly noted that "the government study commission may not exceed its express statutory authority under the HRC & OPL." *In re Referendum Petition for Government Study Commission, supra,* at \*26. Although the Commission's retention of Seidel and its investigation of the foregoing items may have been well-intentioned responses to certain complaints that were voiced by county residents at public hearings, and arguably were prompted by the Commission's inability to seasonably obtain requested documents from the county, the fact remains that Seidel's investigation was not "part of the agency's official duties" as required by *Department of Health.* For that reason, Seidel's investigative materials are not shielded from public assess based upon the "noncriminal investigation" exemption under Section 708(b)(17) of the RTKL.

The proffered characterization of Seidel's investigation as a "performance audit" does not alter its discoverability under the RTKL. The "Generally Accepted Government Auditing Standards" (GAGAS) define "performance audits" as audits that "provide objective analysis to assist management and those charged with governance and oversight in using the information to improve program performance and operations, reduce costs, facilitate decision making by parties with responsibility to oversee or initiate corrective action, and contribute to public accountability." *Chawaga*, 91 A.3d at 259 n. 6. Needless to say, the entity conducting the performance audit of the governmental body or agency must possess the authority to do so. *See Department of Auditor General v. State Employees' Retirement System*, 860 A.2d 206, 210-212 (Pa. Cmwlth. 2004) (Department of the auditor general had constitutional and statutory authority to conduct performance audits of State Employees' Retirement System (SERS) and Public School Employees' Retirement System (PSERS) pursuant to Article VIII, Section 10 of the Pennsylvania Constitution and Sections 402 and 403 of The Fiscal Code). The Commonwealth Court in *Chawaga* held that the Department of Public Welfare's performance audit report concerning the National Comprehensive Center for Fathers' compliance with two DPW contracts was not protected from access by the noncriminal investigation exemption under 65 P.S. § 67.708(b)(17). In so holding, the *Chawaga* Court reasoned that "DPW's performance audit was not part of the DPW's legislatively granted fact-finding or investigative powers; rather, the audit was ancillary to DPW's public assistance services." *Chawaga*, 91 A.3d at 259. For the reasons stated above, the HRC & OPL did not grant the Commission or its consultants the authority to conduct performance audits pursuant to the GAGAS. Thus, even if Seidel's investigation is designated as a "performance audit," it is not exempt under Section

708(b)(17) of the RTKL since it was not part of the Commission's legislatively granted investigative powers.[10] *See Chawaga, supra.*

(2) One-Time Inquiry

Assuming *arguendo* that Seidel's investigation or performance audit was part of the Commission's "official duties" under the HRC & OPL, Seidel's materials still would not be insulated from public access by the "noncriminal investigation" exemption. In addition to being within the agency's legislatively granted fact-finding and investigative powers, the review must also constitute a "systematic or searching inquiry" or "detailed examination," rather than "a one-time inquiry," to qualify for protection under Section 708(b)(17) of the RTKL. *Chawaga,* 91 A.3d at 259 (holding that "DPW's performance audit report was not part of a 'systematic or searching inquiry' or a 'detailed examination'" since "DPW conducted a one-time inquiry into NCCF's finances by interviewing management; reviewing the general ledger, payroll records, invoices, and client case files; inventorying the manufacturing equipment; and examining various other supporting documents."). Seidel admitted under oath that he merely conducted a "one-time inquiry" for the Commission, as opposed to a recurring or systematic probe. (T. P. 10/16/14 at p. 106). Therefore, based upon *Chawaga,* and Seidel's own testimony, Seidel's materials

---

10. With regard to the Commission's and Seidel's "noncriminal investigation" exemption argument predicated upon protection for "[w]ork papers underlying an audit," 65 P.S. § 67.708(b)(17)(v), it is noteworthy that the Statements on Auditing Standards (SAS) issued by the American Institute of Certified Public Accountants (AICPA) and Black's Law Dictionary define "work papers" as the records retained by independent auditors or accountants of "the procedures applied, the tests performed, the information obtained, and the conclusions reached" in a formal audit. *Kelly, supra,* at *6. The record is devoid of any suggestion that Seidel is certified as an independent auditor or accountant.

would not be protected by the "noncriminal investigation" exemption even if Seidel's investigation or performance audit was part of the Commission's "official duties" under its enabling legislation. *See Chawaga, supra* ("Unlike the comprehensive, repeated, on-site inspections of nursing homes conducted in *Department of Health*, DPW did not make regular and repeated visits to NCCF locations" as part of systematic inquiries). In sum, the Commission has not satisfied its burden of proving by a preponderance of the evidence that Seidel's unredacted records are exempt from disclosure under 65 P.S. § 67.708(b)(17).

(D) PRODUCTION OF ELECTRONICALLY STORED RECORD

Under Section 2921(d) of the HRC & OPL, 53 Pa.C.S. § 2921(d), the Commission's records were to be provided to the county "and made available for public inspection" upon the discharge of the Commission. *See McCord v. Pennsylvanians for Union Reform*, 2014 WL 4724425, at *5 (Pa. Cmwlth. 2014) ("Nothing in the RTKL shall supersede or modify the public or nonpublic nature of a record or document established in...state law.") (quoting 65 P.S. § 67.306). Based upon the foregoing discussion in Section II(C) above, the unredacted versions of the three emails included in Seidel's investigative records are not exempt from disclosure under the RTKL.

Section 102 of the RTKL defines a "record" as any information "that is created, received or retained" in connection with any activity of an agency, "regardless of physical form or characteristics," and includes "information stored or maintained electronically." 65 P.S. § 67.102. Section 704(b) permits an agency to respond to a right-to-know request by agreeing to "provide access to inspect the record electronically," 65 P.S. § 67.704(b)(1), and if the requester "is unwilling or unable to access

the record electronically," the requester may demand that the agency "have the record converted to paper." 65 P.S. § 67.704(b)(2). *See also* 65 P.S. § 67.701(a) ("A record being provided to a requester shall be provided in the medium requested if it exists in that medium; otherwise, it shall be provided in the medium in which it exists."). As a result, emails are subject to production under the RTKL even if they have been deleted by the agency's representative. *See, e.g., Barkeyville Borough v. Stearns,* 35 A.3d 91, 94 (Pa. Cmwlth. 2012) (affirming trial court ruling requiring production of emails after the trial court "note[d] that even deleted emails continue to exist from the moment of transmission and may be accessed from any computer with internet connection.").

Although Seidel testified that the emails are "gone forever" and "impossible" to retrieve following the service of his computer by T. R. Associates, (T. P. 10/16/14 at p.89), we accept as credible and conclusive the expert opinion of Leonard Deutchman, Esquire, that the subject emails may be recovered from Frontier Internet Service's email server. Thus, Seidel will be ordered to secure unredacted copies of the three emails from his internet service provider and to thereafter provide them to The Scranton Times. If Frontier Internet Service is unable to retrieve 3of providing Seidel's computer to a forensic analyst or a drive recovery specialist to retrieve those three emails. An appropriate order follows.

## ORDER

And now, this 14th day of November, 2014, upon consideration of the "Amended Petition for Review of Final Determination Issued by the Office of Open Records of the Commonwealth of Pennsylvania" filed by Lackawanna County Government Study Commission, the memoranda of law submitted by the petitioner, respondent

and intervenors, the testimony and evidence introduced by the parties during the evidentiary hearing on October 16, 2014, and the expert report of Leonard Deutchman, Esquire, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that:

1. The "Amended Petition for Review of Final Determination Issued by the Office of Open Records of the Commonwealth of Pennsylvania" is denied in accordance with the foregoing memorandum;

2. Within the next thirty (30) days, Seidel Investigations and Consulting, Inc., shall obtain from Frontier Internet Service unredacted copies of (a) the email forwarded to James F. Seidel on February 4, 2014, with the subject header "16 Link," (b) the email transmitted to James F. Seidel on February 5, 2014, bearing the subject line "Corey O'Brien," and (c) the email delivered to James F. Seidel on April 25, 2014, with the subject header "Fix Lackawanna;"

3. In the event that Frontier Internet Service is unable to retrieve those three emails from its email server and to provide them to Seidel Investigations and Consulting, Inc., for production to The Scranton Times, L.P. d/b/a The Times-Tribune, consideration will be given to the court-ordered delivery of the computer of James F. Seidel and Seidel Investigations and Consulting, Inc., to a forensic analyst or a drive recovery specialist to retrieve the subject emails for production in an unredacted format; and

4. To the extent that the final determination of the Office of Open Records dated July 10, 2014, required the production of unredacted copies of the foregoing emails, it is affirmed.